IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IAN WILY,<br><br>      Plaintiff,<br><br>v.<br><br>THE THIRD DISTRICT COURT FOR SALT LAKE COUNTY,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00484-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is a motion for summary judgment filed by Defendant The Third District Court for Salt Lake County ("the Third District Court" or "Defendant") [ECF No. 36]. The court held oral argument on the motion on March 17, 2022. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court GRANTS Defendant's motion for summary judgment.

## FACTUAL BACKGROUND

Ian Wily ("Wily") is Polynesian (Samoan). He began working as a Deputy Probation Officer ("DPO") for the Third District Court in March 2004. The Third District Court promoted Wily to Deputy Probation Officer Supervisor over ten years ago. As part of his role, Wily supervised a team of DPOs and managed a program where youth probationers performed court-ordered community service.

The events underlying this case began when one of the DPOs on Wily's team, Jose Palza ("Palza") complained to Human Resources about Wily's management of the team. Specifically,

Palza alleged that Wily favored the Polynesian DPOs on the team over the non-Polynesian team members by giving them better assignments and allowing them to bend the rules without repercussions. Palza further complained that the Polynesian employees sometimes spoke Samoan at work in order to mock or exclude Palza.

Based on Palza's complaints, HR opened an investigation into Wily's conduct and interviewed members of Wily's team. After the interviews took place, Wily approached Palza to ask him how the interview went. Wily also commented on the ongoing investigation during a team meeting with DPOs. HR viewed the fact that Wily engaged in conversations about an ongoing investigation as an inappropriate attempt to influence the investigation and subsequently placed him on administrative leave pending the results of the investigation.

The investigation concluded that Palza's complaints were unsubstantiated. However, the investigation also uncovered a number of policy violations by Wily. First, HR learned how Wily contravened a contract between the Utah Department of Transportation ("UDOT") and the Third District Court. Under the contract, UDOT pays the Third District Court to have youth in the court's probation program work community service hours on projects for UDOT. The DPO managing a particular project lists the number of youth probationers and the hours spent on a particular project. UDOT then compensates the Third District Court for that amount of work. The contract provides only for payment for work performed by youth probationers. Wily, however, directed his team members to count any DPO staff present at the project for purposes of the invoice to UDOT. In essence, Wily directed his team members to overbill UDOT in violation of the contract.

Second, the investigation exposed that Wily had permitted at least one team member to violate Third District Court policy regarding secondary employment. Specifically, court policy

requires any employee who obtained secondary employment to fill out a written form to obtain permission for that secondary employment. The Third District Court has this policy in place to avoid conflicts of interest and to ensure that secondary employment does not interfere with the quality of the employee's performance in their primary job. When a DPO on Wily's team, Kone Tevaga ("Tevaga"), obtained secondary employment monitoring teenage residents at a youth residential treatment center on the graveyard shift, Wily told him that it was up to him whether to submit the secondary employment form. HR viewed this as problematic because, in addition to Wily's failure to instruct his team member to follow court policy, he also failed to identify (1) a clear conflict of interest—the youth residential treatment center served the same at-risk youth population as the Third District Court—and (2) a clear impediment to Tevaga's primary job—working the graveyard shift—that raised serious concerns about Tevaga's ability to safely drive youth probationers to morning work sites after not sleeping all night.

Following the investigation, Neira Siaperas ("Siaperas"), the Trial Court Executive in charge of personnel management at the Third District Court, considered both aggravating and mitigating circumstances to determine what disciplinary action to take against Wily. While Wily's length of employment with the court and his prior positive performance weighed against termination, Siaperas determined that the multiple policy violations, the severity of the policy violations, and the potential harm to persons or property related to the violations required termination.

The Third District Court issued a Notice of Pending Termination on April 19, 2018. The Notice cited Wily's decision to insert himself into the HR investigation process, his decision to violate the UDOT contract, and his failure to direct his team members that they needed to

complete the secondary employment form as incidents of misconduct sufficient to warrant termination. The Notice indicated that Wily's termination would take effect on April 26, 2018.

On April 23, 2018, Wily filed a complaint with the Utah Anti-Discrimination and Labor Division and the Equal Employment Opportunity Commission alleging unlawful discrimination and retaliation in violation of Title VII. On May 8, 2019, Wily received a Notice of Right to Sue from the EEOC. On July 10, 2019, Wily filed this lawsuit in federal court.

Wily's present complaint of racial and national origin discrimination arises from a particular question that HR posed to Wily as part of the investigation into Palza's complaints. Specifically, HR asked about Wily's use of Samoan in the workplace. Wily was unaware of the subject of the investigation—that Palza had complained that, among other things, he felt excluded by Wily's use of Samoan in the workplace. Accordingly, Wily believed that his language and Samoan identity had nothing to do with his job. He, instead, felt that HR was using his language and his race to try to find a reason to fire him. For this reason, Wily contends that his termination resulted from racial and/or national origin discrimination.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must

"view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

Wily brings two claims against the Third District Court. First, Wily claims that the Third District Court discriminated against him based on his race or national origin in violation of Title VII. Second, Wily claims that the Third District Court retaliated against him based on his race or national origin in violation of Title VII. The Third District Court moves for summary judgment on both claims. For the following reasons, the court GRANTS Defendant's motion.

### I. DISCRIMINATION

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). In order to establish a prima facie case of racial or national origin discrimination, a plaintiff must show that "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). Once an employee establishes a prima facie case of employment discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action. *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). The burden then shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, both parties agree that Wily was a member of a protected class and that Wily had received a number of positive job reviews. And Wily does not dispute that the Third District

Court articulated a number of legitimate, nondiscriminatory reasons for firing him. Accordingly, the court addresses only whether Wily's termination occurred under circumstances giving rise to an inference of discrimination and whether Wily can prove pretext.

### A. *Inference of Discrimination*

An inference of discrimination can be established in a variety of ways, such as through evidence of "actions or remarks made by decisionmakers, preferential treatment given to employees outside the protected class, or more generally, upon the timing or sequence of events leading to [the] plaintiff's termination." *Barlow v. C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (citation and quotation marks omitted).

Here, the only potentially discriminatory action that Wily points to is the question during the HR investigation regarding his use of Samoan in the workplace. *See* ECF No. 36-7, at 33. Specifically, Wily contends that "they were treating me different [a]nd the fact that they talked to me about my language leads me to believe that it was discriminatory." *Id.* But HR raised Wily's language usage solely in response to Palza's complaint that Wily and other Samoan DPOs on his team excluded Palza by speaking Samoan in the workplace. Indeed, HR had to refer to Wily's use of Samoan because it formed the basis of one of Palza's complaints that the department was investigating. And Wily adduces no evidence that the Third District Court harbored any discriminatory aim when its HR department posed that question to Wily. Wily acknowledges that, in fact, the Third District Court valued his ability to speak Samoan because it allowed him to communicate with parents who spoke only Samoan. *See id.* at 12. Moreover, the Third District Court demonstrated its appreciation for Wily's ability to speak Samoan by paying him a stipend for that ability. *Id.* At bottom, there is simply no evidence that the question about Wily's use of

Samoan in the workplace was anything other than a valid attempt to investigate another employee's discrimination complaint.

In sum, "[n]ot every reference to an employee's race or national origin in the workplace gives rise to an inference of discrimination." *Faragalla v. Douglas Cnty. Sch. Dist.*, 411 F. App'x 140, 153 (10th Cir. 2011) (unpublished). Here, the Third District Court offers a reasonable explanation for why it needed to question Wily about his use of Samoan in the workplace. And the evidence supports the Third District Court's explanation. *See, e.g.*, ECF No. 36-4, at 2-3 (discussing Palza's complaint that he was bullied by Wily and several team members because "he's not part of the Polynesian group on the crew" and indicating that it "most definitely should be addressed"); ECF No. 41-4, at 6 (discussing investigation into Wily's use of Samoan in the workplace based on Palza's complaint). Finally, Wily concedes that, beyond the question about his use of Samoan, he can point to no evidence of discrimination in the workplace. ECF No. 36-7, at 33 ("Q: Is there anything else [besides the question about Samoan language usage in the workplace] that leads you to believe that it was discriminatory? A: No."). Therefore, Wily has failed to adduce evidence that would support an inference of discrimination and, accordingly, he cannot establish a prima facie case of discrimination.

### B.     Pretext

Even were Wily to establish a prima facie case of discrimination, his case would still fail on the pretext prong. After a plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Rivera*, 365 F.3d at 920. The Third District Court laid out a series of legitimate, non-discriminatory reasons to terminate Wily: (1) He inappropriately inserted himself into an HR investigation; (2) he directed team members to violate the Third District Court's contract with

UDOT; and (3) he failed to direct team members to fill out a secondary employment form in violation of Third District Court policy. ECF No. 36-1, at 2-3. Accordingly, the burden shifts back to Wily to prove, by a preponderance of the evidence, that the legitimate reasons offered by the Third District Court were not its true reasons, but rather a pretext for discrimination. *See Rivera*, 365 F.3d at 920.

But Wily has pointed to no evidence that any of the Third District Court's stated reasons are pretext for racial or national origin discrimination. Indeed, Wily testified in his deposition that he believes the true reason that the Third District Court wanted to terminate his employment was because he "wasn't the yes-guy," i.e., that he spoke up when his DPOs experienced low morale and other frustrations at work. ECF No. 36-7, at 19. And, Wily contends, once he began voicing complaints to Bob Curfew, his supervisor, on behalf of his team of DPOs, then Curfew and the leadership team believed they had to get rid of him. *Id.* at 20 ("As soon as I spoke up . . . [a]s soon as all those things were brought up, then it's we got to get rid of Ian."). Wily further elaborated that he believed that Curfew felt threatened that Wily knew so much about the probation program and that many DPOs liked the way that Wily did things. *Id.* at 19.

All of the underlying reasons that Wily advances to explain his termination are grounded in tension between himself and his supervisors based on interpersonal issues and disagreements over policy—not based on race or national origin. But generic dislike is not discrimination. *See, e.g.*, *Holmes v. Regents of Univ. of Colo.*, 176 F.3d 488 (Table), at *8 (10th Cir. 1999) (unpublished) ("[W]e emphasize that our federal employment laws are not intended to remedy every instance of interpersonal conflict occurring in the workplace—only those motivated by improper discriminatory purposes."); *Alvarado v. Donley*, 490 F. App'x 932, 937 (10th Cir. 2012) (unpublished) (finding that the evidence "fail[ed] to give rise to a credible inference of pretext

8

for racial discrimination" where the plaintiff "offers no admissible evidence . . . that whatever dislike [his supervisor] had for [the plaintiff] was a consequence of (or even tangentially related to) [the plaintiff's] race"); *Plotke v. White*, 405 F.3d 1092, 1108 (10th Cir. 2005) (Tymkovich, J., concurring) ("Personal dislike does not necessarily equate with intentional discrimination."). Nor can differences over policy decisions form the basis for a Title VII claim. *See, e.g.*, *Johnson v. E.A. Miller, Inc.*, 172 F.3d 62 (Table), at *1 (10th Cir. 1999) ("The fact that Ms. Johnson is both female and disagrees with the wisdom of the company's business decisions does not state a claim for sex discrimination."). At bottom, policy disputes and personality conflicts between employees are not the business of the federal courts.

Accordingly, the court finds that Wily has failed to establish any evidence that the Third District Court relied on pretextual reasons to mask a discriminatory intent in firing him.

## II.  RETALIATION

Title VII prohibits employers from discriminating against any employee "because he has made a charge, testified, assisted, or participated in any manner in a [Title VII] investigation." 42 U.S.C. § 2000e-3(a). Any plaintiff bringing a Title VII retaliation claim must first prove a prima facie case of retaliation. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). To establish a prima facie case of retaliation, a plaintiff must demonstrate "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

Protected activity includes filing a discrimination complaint with UALD. *See, e.g.*, *Holly v. Kindred Healthcare Operating, Inc.*, 51 F. Supp. 3d 1113, 1124 (D. Utah 2014); *Kosan v. Utah*

*Dep't of Corrs.*, No. 2:06-cv-592, 2007 WL 3254921, at *8 (D. Utah Nov. 2, 2007). But, critically, the protected activity must precede the materially adverse action. Here, Wily suffered a materially adverse action when the Third District Court issued a Notice of Termination on April 19, 2018. ECF No. 36-1, at 2. However, Wily does not dispute that he did not complain to the UALD about racial discrimination in the workplace until April 23, 2018. ECF No 36-10, at 2. And "for a protected activity to *cause* the adverse employment action, the adverse action must necessarily occur *after* the protected activity." *Sunderman v. Westar Energy, Inc.*, 307 F. App'x 224, 229 (10th Cir. 2009) (unpublished) (rejecting retaliation claim where "plaintiff sought to rely on alleged retaliatory acts that occurred *prior to* his protected activity—the filing of his EEOC charge"). Because Wily's complaint to the UALD postdates the Third District Court's Notice of Pending Termination, the protected activity could not have caused the adverse employment action.

Indeed, Wily cites only one instance where he complained to superiors that predates the Notice of Pending Termination. Specifically, Wily "met with HR to voice his work crew's concerns about how [Curfew] was making changes to certain policies that affected the DPO's duties." ECF No. 41, at 18; ECF No. 36-4, at 2 (noting that the meeting occurred on March 23, 2018). But such a complaint does not qualify as "protected activity." Wily does not allege that his complaints to Curfew hinged on racial or national origin discrimination nor that he even referenced any sort of unlawful discrimination during the relevant meeting. And "an employee's complaints regarding unfair treatment, no matter how unconscionable, cannot be 'protected opposition to discrimination' unless the basis for the alleged unfair treatment is some form of unlawful discrimination in violation of Title VII." *Faragalla*, 411 F. App'x at 148; *see also Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (holding, in the context of the

ADEA, that "[a]lthough no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [law]"). Accordingly, the court GRANTS Defendant's motion for summary judgment as to Wily's retaliation claim.

## CONCLUSION AND ORDER

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment.

DATED March 21, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge